James Everett Shelton
316 Covered Bridge Road
King of Prussia, PA 19406
(484) 626-3942
jeshelton595@gmail.com
Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES EVERETT SHELTON<br>316 Covered Bridge Road<br>King of Prussia, PA 19406<br>      Plaintiff,<br><br>    vs.<br><br>FCS CAPITAL LLC, d/b/a FUNDING<br>CAPITAL SOURCE, d/b/a BUSINESS DEBT<br>EXPERTS, f/k/a BUSINESS DEBT RELIEF LLC<br>30 Montgomery Street Suite 1200,<br>Jersey City, NJ 07302<br><br>EMIL YASHAYEV, individually and as Owner/<br>CEO and Managing Member of FCS Capital<br>LLC,<br>1088 Dearborn Rd,<br>Fort Lee, NJ 07024<br><br>BARRY SHARGEL, individually and as<br>Managing Member of FCS Capital  LLC,<br>30 Montgomery Street Suite 1200,<br>Jersey City, NJ 07302<br><br>JACOVETTI LAW, P.C., d/b/a Law Office of<br>Robert Jacovetti, P.C.<br>194 Old Country Road<br>Mineola, NY 11501<br><br>ROBERT C. JACOVETTI<br>65 Columbia Rd,<br>Rockville Centre, NY 11570<br>      Defendants | Civil Action<br><br>No. 2:18-cv-03723-NIQA<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Jury Trial Demanded |

## PLAINTIFF'S FIRST AMENDED COMPLAINT:

1

Plaintiff JAMES EVERETT SHELTON brings this action for damages, statutory damages, court costs, and injunctive relief under rights pursuant to Federal Statute under 47 U.S.C. 227, and 47 C.F.R. 64, and the Pennsylvania Telemarketer Registration Act, 73. P. S. § 2245.2(A), for the *ultra vires* illegal actions and deliberate and knowing tortious activity of FCS CAPITAL LLC, d/b/a FUNDING CAPITAL SOURCE, d/b/a BUSINESS DEBT EXPERTS, f/k/a BUSINESS DEBT RELIEF LLC ("FCS"), EMIL YASHAYEV ("Mr. Yashayev"), BARRY SHARGEL ("Mr. Shargel"), JACOVETTI LAW, P.C., d/b/a LAW OFFICE OF ROBERT JACOVETTI, P.C., and ROBERT C. JACOVETTI, individually ("Attorney Jacovetti"), collectively "Defendants", in negligently and/or willfully contacting Plaintiff via Plaintiff's telephone to solicit sales ("Sales Calls") using an automatic telephone dialing system ("ATDS calls") in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* and related claims that form part of the same claim or controversy. Plaintiff demands a trial by jury, and complains and alleges as follows:

## I.  Introduction

1.      Plaintiff James Everett Shelton ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

2.      Plaintiff alleges that Defendants made or commissioned numerous telemarketing calls to Plaintiff's cellular telephone number for the purposes of advertising FCS's services. Many of these calls were made using an automatic telephone dialing system ("ATDS"), which is prohibited by the TCPA.

2

3.      Plaintiff also alleges that the Defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* ("PCPL") due to their violation of Pennsylvania's Telemarketer Registration Act, 73 P.S. § 2241 *et seq.* ("PTRA").

4.      The telemarketing calls that took place after July 31, 2018 to Plaintiff were a violation of the PTRA because they were made to his residential telephone number that he had placed on the Commonwealth of Pennsylvania Do Not Call List.

5.      Plaintiff never consented to receive any of these calls, which were made *after* Plaintiff wrote to one of FCS' employees and told him Plaintiff did not wish to receive any telemarketing calls.

6.      All of the claims asserted herein arise out of FCS's illegal telephone solicitation campaign and are a common fact pattern.

## II.      Jurisdiction and Venue

7.      The Court has federal question jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).

8.      This Court has supplemental jurisdiction over the related state law claims as they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the illegal telemarketing calls that are the subject of this lawsuit were sent into this District.

## III.      Parties

10.      Plaintiff JAMES EVERETT SHELTON ("Plaintiff") is an individual who received the alleged phone calls on his private mobile telephone line mentioned herein. Plaintiff is an adult individual and citizen of the Commonwealth of Pennsylvania who has a residence of 316 Covered Bridge Road, King of Prussia, PA 19406.

3

11.     Defendant FCS CAPITAL LLC d/b/a FUNDING CAPITAL SOURCE, d/b/a BUSINESS DEBT EXPERTS, f/k/a BUSINESS DEBT RELIEF ("FCS") is a New Jersey limited liability company with a registered principal address of 30 Montgomery Street Suite 1200, Jersey City, NJ 07302, which transacts business in, *inter alia*, Montgomery County, Pennsylvania. FCS is not registered to do business in the Commonwealth of Pennsylvania, however, FCS markets and sells, *inter alia*, business loan and/or "merchant cash advance" services to people in Pennsylvania.

12.     Upon information and belief, Defendant EMIL YASHAYEV ("Mr. Yashayev"), at or about the time the within violations occurred, was owner, CEO, and a Managing Member of FCS CAPITAL LLC. Upon information and belief, Mr. Yashayev may be served at his usual place of abode, 1088 Dearborn Rd, Fort Lee, NJ 07024.

13.     Upon information and belief, Defendant BARRY SHARGEL ("Mr. Shargel"), at or about the time the within violations occurred, was an officer, manager, Managing Member, partner or *de facto* principal of FCS CAPITAL LLC. Upon information and belief, Mr. Shargel may be served at his usual place of business, 30 Montgomery Street Suite 1200, Jersey City, NJ 07302.

14.     Defendant JACOVETTI LAW, P.C. is a New York professional corporation owned and operated by Defendant Robert C. Jacovetti, Esquire. The address listed on the New York Secretary of State website for Jacovetti Law, P.C. is 65 Columbia Road, Rockville Centre, New York, 11570. Robert C. Jacovetti is the Chief Executive Officer and the primary owner. 194 Old Country Road, Mineola, NY 11501 is the law office's address listed on Jacovetti Law, P.C.'s website www.newyorkdebtlawyer.com.

15.     LAW OFFICE OF ROBERT C. JACOVETTI, P.C. is a fictitious business name used and by Defendant Robert C. Jacovetti, Esquire and/or Jacovetti Law, P.C.

4

**16.**     Defendant ROBERT C. JACOVETTI ("Attorney Jacovetti") is a licensed New York attorney who is sixty-five (65) years old, and has been admitted to the New York Bar since September 20, 2006. Attorney Jacovetti's New York Bar ID Number is 4413639. Attorney Jacovetti is not licensed to practice law in Pennsylvania, however, Attorney Jacovetti's employees, agents, and/or closely-connected clients routinely target people in the Commonwealth of Pennsylvania to generate or solicit new business, despite the fact that Attorney Jacovetti is not admitted to the Pennsylvania Bar. Upon information and belief, Attorney Jacovetti may be served at either his usual place of abode, 65 Columbia Road, Rockville Centre, New York, 11570, or at his usual place of business, 194 Old Country Road, Mineola, NY 11501.

**17.**     At all times herein mentioned, defendants FCS, Mr. Yashayev, Mr. Shargel, Mr. Deangelis, Jacovetti Law, and Attorney Jacovetti, and each of them, were an agent or joint venture of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

**18.**     At all times herein mentioned, the Defendants, and each of them, were an agent or joint venture of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

**19.**     Defendants, and each of them, aided and abetted, encouraged and rendered substantial

assistance to the other Defendants in committing the wrongful acts alleged herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

20.     At all times herein mentioned, Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others in engaging and/or planning to engage in the activities detailed herein to accomplish the wrongful conduct, wrongful goals, and wrongdoing.

## **Background**
## **The Telephone Consumer Protection Act**

21.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

### The TCPA's Prohibition of Automated Telemarketing Calls

22.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

23.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are

prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

24.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

25.     In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines.  Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

<u>The National Do Not Call Registry</u>

26.     Perhaps the most well-known aspect of the TCPA was the creation of the National Do Not Call Registry. By adding a telephone number to the Registry, a consumer can indicate their desire not to receive telephone solicitations. *See* 47 C.F.R. § 64.1200(c)(2).

27.     The TCPA and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

**The TCPA imposes personal liability on individuals who participate in or commission telemarketing calls.**

28.     Under the TCPA, an individual such as Mr. Yashayev, Mr. Shargel, and Attorney Jacovetti may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*:

[T]he act, omission, or failure of any agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*

47 U.S.C. § 217 (emphasis added).

29.     When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. See, *e.g., Jackson v. Five Star Catering, Inc., v. Beason,* 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

30.     Defendants Mr. Yashayev and Mr. Shargel are personally liable under the "participation theory" of liability because they were the Principal owners of FCS, knew of FCS's violations, and directed employees and/or agents of FCS to continue making those violations. Additionally, Mr. Shargel himself participated in some of these violations, including directly calling the Plaintiff in violation of the TCPA, and e-mailing the Plaintiff to follow up.

31.     This is because Defendants Mr. Yashayev and Mr. Shargel authorized and oversaw each of FCS's telemarketing processes and calls which were made on behalf of FCS.

8

32.    Furthermore, Defendants Mr. Yashayev and Mr. Shargel are also personally liable because they were responsible for ensuring FCS's agents and/or employees' TCPA compliance.

33.    Attorney Jacovetti is personally liable for the wrongful acts of FCS and its agents, because he was responsible for directing his clients to place these calls, and directed benefitted from the telemarketing campaign financially by way of receiving new clients.

34.    Attorney Jacovetti and Jacovetti Law, P.C. participated with agents of FCS, d/b/a "Business Debt Experts" on the telemarketing campaign, including reviewing call records and recordings of telemarketing calls made into this District, which were made without consent in violation of 18 Pa. Cons. Stat. § 5703.

35.    It is believed, and therefore averred, that FCS Capital LLC d/b/a Business Debt Experts refers new clients to Attorney Jacovetti and the Jacovetti Law defendants for legal representation to negotiate debts down with a client's creditors, therefore, they have a direct agency relationship. A representative of "Business Debt Experts" admitted they are a "law office" and they work for, or on behalf of, Attorney Jacovetti and Jacovetti Law.

**Pennsylvania's Unfair Trade Practices and**

**Consumer Protection Law and Pennsylvania's Telemarketer Registration Act**

36.    Pennsylvania's Telemarketer Registration Act, 73 P.S. § 2241 *et seq.* provides, "[a] violation of this act is also a violation of the act of December 17, 1968 (P.L.1224, No.387), known as the Unfair Trade Practices and Consumer Protection Law." 73 P.S. § 2241.6(a).

37.    The PTRA prohibits any call to numbers on Pennsylvania's Do Not Call list:

No telemarketer shall initiate or cause to be initiated a telephone solicitation call to a residential telephone number of a residential telephone subscriber who does not wish to receive telephone solicitation calls and has caused his name, address and telephone number to be enrolled on a do-not-call- list maintained by the list administrator.  This prohibition shall be effective 30 days after a quarterly do-not-call list is issued by the list administrator which first contains a residential telephone subscriber's name, address and residential telephone number.

*See* 73 P.S. § 2245.2.

## **Factual Allegations**

**38.**    Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

**39.**    FCS provides and/or brokers "merchant cash advances" to companies. A merchant cash advance is a form of short-term alternative lending or "factoring".

**40.**    FCS uses telemarketing to promote its products and services.

**41.**    FCS also provides debt reduction and/or debt negotiation services.

**42.**    During outbound communications with new potential clients, FCS' employees claim they are a "law office", specifically, the Law Office of Robert Jacovetti, P.C., which is a "DBA Name" for Jacovetti Law, P.C.

**43.**    FCS works directly with Attorney Jacovetti and the Jacovetti Law defendants to negotiate with a client's creditors. Specifically, FCS refers its new business to Attorney Jacovetti's office, and FCS and Jacovetti both benefit from this arrangement financially.

**44.**    FCS's telemarketing efforts also include the use of automated dialing equipment to send automated calls to consumers nationwide.

**45.**    On March 16, 2018, Plaintiff received a telemarketing call from Fast Advance Funding, LLC, which is not a party to this lawsuit. As a result of this telemarketing call, Plaintiff received an e-mail from "Ben Schorr", ben@fastadvancefunding.com. The subject-line of the header read "Fast Advance Funding/ Michael Deangelis". The e-mail included the contact information of a "Mike Deangelis", a Senior Funding Specialist at Fast Advance Funding. This contact information included Mr. Deangelis' personal cell phone number, 347-493-7857.

**46.**    Fast Advance Funding, LLC ("FAF") continued to make telemarketing calls to Plaintiff

in the following six weeks. On May 1, 2018 at 2:45 PM, Plaintiff sent an e-mail to FAF's legal

counsel, Norman M. Valz, and also sent an e-mail to ben@fastadvancefunding.com, which was

the same e-mail address that had Michael Deangelis' contact information and cell phone number.

In this e-mail, Plaintiff expressly told FAF and Mr. Deangelis that Plaintiff did not wish to

receive any more telemarketing calls, and threatened to file a formal claim.

47.     On May 1, 2018 at 5:06 PM, *in a non-actionable phone call from which Plaintiff is not

seeking to recover damages*, Michael Deangelis called Plaintiff from his personal cell phone

number, 347-493-7857. Mr. Deangelis said that he no longer worked for FAF, and said he now

worked for FCS. Mr. Deangelis asked Plaintiff if he was interested in receiving some working

capital, however, Plaintiff firmly told Mr. Deangelis that he was not interested and merely

wanted to be left alone. Plaintiff further told Mr. Deangelis that he was going to sue FAF for

violating the TCPA, and told Mr. Deangelis that he has sued many telemarketers for illegally

calling his phone. Mr. Deangelis said the company he now works for, Funding Capital Source

("FCS"), is a good company and does not violate the TCPA. Plaintiff told Mr. Deangelis that his

current company, FCS, had better not call the Plaintiff, or he would sue FCS, too. Plaintiff asked

Mr. Deangelis why he was still receiving e-mails from a FAF e-mail address if he no longer was

employed with FAF, however, Mr. Deangelis said this e-mail was forwarded to his personal e-

mail address.

48.     This telephone call and e-mail constituted express notice that Plaintiff did not want to

be contacted by telemarketers or by Mr. Deangelis.

49.     Mr. Deangelis confirmed receipt of Plaintiff's e-mail by virtue of calling the Plaintiff

and discussing the matter.

50.     Mr. Deangelis was employed by FCS on May 1, 2018.

51.     Mr. Deangelis knew that Plaintiff did not want to receive any telemarketing calls, but did not place Plaintiff's number on FCS' internal Do-Not-Call list, as evidenced by the following factual allegations.

52.     On May 4, 2018 at 3:19 PM, the Plaintiff received a telemarketing call on his cellular telephone number (484) 626-3942 from a number which displayed on Plaintiff's caller identification as 347-707-7972.

53.     Plaintiff received all of the calls as alleged herein on his personal cellular telephone number, (484) 626-3942. Plaintiff's number has been successfully registered on the National Do-Not-Call registry since June 26, 2015, more than thirty-one (31) days prior to the call, and has also been successfully registered on the Pennsylvania Do-Not-Call list since May 15, 2018.

54.     (484) 626-3942 is the only telephone number which Plaintiff owns.

55.     Plaintiff was connected with Michael Deangelis with "Business Debt Experts".

56.     Plaintiff heard a scripted sales pitch about business funding.

57.     During that call, Plaintiff took steps to ascertain the identity of the caller and feigned interest for this exact reason, namely by requesting that the caller send Plaintiff an e-mail with their company information. However, Plaintiff never consented to receiving any additional telemarketing calls.

58.     Mr. Deangelis then attempted to sell Plaintiff FCS' services.

59.     Upon information and belief, "Business Debt Experts" is a fictitious name owned and/or used by FCS and/or Attorney Jacovetti.

60.     As a result of this call, Michael Deangelis, michael@businessdebtexperts.com, contacted the Plaintiff by e-mail attempting to get the Plaintiff to purchase FCS's services. This e-mail included a link to FCS's website, fundingcapitalsource.com, and included a PDF

attachment "FCS CAPITAL APP" for Plaintiff to fill out and return to FCS. The PDF application

was on FCS' letterhead and included FCS's logo, name, address, telephone and fax numbers.

**61.**    During this phone call, Plaintiff reminded Mr. Deangelis that he had spoken to him just

three (3) days ago and that Plaintiff had sent Mr. Deangelis an e-mail telling him not to make

telemarketing calls to his phone. Mr. Deangelis said that he talked with "hundreds of people

every day" but that he did remember their conversation. Nevertheless, despite Plaintiff's

admonition that Plaintiff would file a formal claim against a telemarketer that illegally called his

phone, and despite Plaintiff's request to not receive any additional telemarketing calls, Mr.

Deangelis did not comply with Plaintiff's requests to be placed on FCS' internal Do-Not-Call

list.

**62.**    On May 7, 2018 at 12:28 PM, Mr. Deangelis called Plaintiff again from his personal

cell phone number, 347-493-7857, to attempt to get the Plaintiff to purchase FCS's services.

When Plaintiff realized it was Mr. Deangelis calling again, he simply terminated the call,

because he was busy and did not want the defendants' services.

**63.**    On May 7, 2018 at 12:30 PM, Mr. Deangelis sent a text message to Plaintiff's cell

phone attempting to get the Plaintiff to purchase FCS's services.

**64.**    A text message is considered a "call" under the TCPA.

**65.**    On May 7, 2018 at 2:04 PM, Plaintiff received a telemarketing call which displayed on

Plaintiff's caller identification as 347-707-7962.

**66.**    Plaintiff was connected with Michael Deangelis at FCS.

**67.**    Mr. Deangelis once again attempted to sell the Plaintiff FCS' services, but did not send

Plaintiff an e-mail.

**68.**    On May 8, 2018 at 11:46 AM, Plaintiff received a call which displayed on Plaintiff's

13

caller identification as 347-707-7943.

**69.**     Plaintiff was connected with Michael Deangelis at FCS.

**70.**     Mr. Deangelis then attempted to sell Plaintiff FCS' services.

**71.**     Since this was a different incoming caller ID, Plaintiff wanted to make sure that it was FCS calling, and not some other lending company.

**72.**     As a result of this call, Mr. Deangelis, michael@businessdebtexperts.com, contacted the Plaintif by e-mail at 11:56 AM on May 8, 2018, attempting to get the Plaintiff to purchase FCS's services. This e-mail included a link to FCS's website, fundingcapitalsource.com, and included a PDF attachment "FCS CAPITAL APP" for Plaintiff to fill out and return to FCS. The PDF application was on FCS' letterhead and included FCS's logo, name, address, telephone and fax numbers.

**73.**     On May 8, 2018 at 4:25 PM, Plaintiff received another call from FCS at 347-707-7943. Plaintiff simply hung up because he was not interested in the defendants' services.

**74.**     On May 17, 2018 at 2:06 PM, Plaintiff received a call which displayed on Plaintiff's caller ID as 201-455-3787.

**75.**     The telemarketing call began with a distinctive click and pause after the Plaintiff answered.

**76.**     In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**77.**     Plaintiff heard a "bloop" balloon-popping sound, followed by choppy audio and a machine noise, before he was connected with defendant Barry Shargel at FCS.

**78.**     Mr. Shargel attempted to sell FCS' services to the Plaintiff.

**79.**     As a result of this automated call, Barry Shargel, Director of Operations and Managing

Member of FCS, barry@fundingcapitalsource.com, contacted the Plaintiff at 2:12 PM on May 17, 2018 attempting to get the Plaintiff to purchase FCS's services.

**80.** On May 22, 2018 at 12:15 PM, Plaintiff received an automated call from 347-707-7973. The telemarketing call began with a distinctive click and pause after the Plaintiff answered.

**81.** These facts, as well as the geographic distance between the Plaintiff and the Defendant, as well as the fact that this call was part of a nationwide telemarketing campaign demonstrate that the call was made using an automatic telephone dialing system ("ATDS" or "autodialer") as that term is defined in 47 U.S.C. 227(a)(1).

**82.** In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**83.** Plaintiff heard a "bloop" balloon-popping sound, followed by choppy audio and a machine noise, before he was connected with "Anthony Diaz" at FCS.

**84.** Plaintiff then received a scripted sales pitch about business funding from "Anthony Diaz".

**85.** As a result of this automated call, Anthony Diaz, anthony@businessdebtexperts.com, contacted the Plaintiff via e-mail on May 22, 2018 at 12:31 PM, attempting to get the Plaintiff to purchase FCS' services. This e-mail included a link to FCS's website, fundingcapitalsource.com, and included a PDF attachment "FCS CAPITAL APP" for Plaintiff to fill out and return to FCS. The PDF application was on FCS' letterhead and included FCS's logo, name, address, telephone and fax numbers.

**86.** On May 23, 2018 at 11:37 AM, Plaintiff received an automated call which displayed on Plaintiff's caller identification as 646-766-9487. The telemarketing call began with a distinctive click and pause after the Plaintiff answered.

15

**87.**     In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**88.**     Plaintiff heard a "bloop" balloon-popping sound, followed by choppy audio and a machine noise, before he was connected with "Anthony Diaz" at FCS.

**89.**     Plaintiff then received a scripted sales pitch about business funding from "Anthony Diaz", on behalf of FCS.

**90.**     As a result of this automated call, Anthony Diaz, anthony@businessdebtexperts.com, contacted the Plaintiff via e-mail on May 23, 2018 at 11:45 AM, attempting to get the Plaintiff to purchase FCS' services. This e-mail included a link to FCS's website, fundingcapitalsource.com, and included a PDF attachment "FCS CAPITAL APP" for Plaintiff to fill out and return to FCS. The PDF application was on FCS' letterhead and included FCS's logo, name, address, telephone and fax numbers.

**91.**     On May 24, 2018 at 3:29 PM, Plaintiff received an incoming call from "Anthony Diaz" at FCS, from the caller ID 347-707-7943. Plaintiff allowed the call to go to his voicemail. "Anthony Diaz" then left Plaintiff a voicemail attempting to get the Plaintiff to purchase FCS' services.

**92.**     On July 23, 2018 at 3:12 PM, Plaintiff received an incoming call from "Anthony Diaz" at FCS, from the caller ID 347-707-7973.

**93.**     The telemarketing call began with a distinctive click and pause after the Plaintiff answered.

**94.**     In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**95.**     Plaintiff heard a "bloop" balloon-popping sound, followed by choppy audio and a

machine noise, before he was connected with "Anthony Diaz" at FCS.

**96.**     Plaintiff then received a scripted sales pitch about business funding from "Anthony Diaz", on behalf of FCS.

**97.**     As a result of this automated call, on July 23, 2018 at 3:30 PM, "Anthony Diaz", anthony@fundingcapitalsource.com, sent Plaintiff an e-mail attempting to get Plaintiff to purchase FCS' services.

**98.**     On July 25, 2018 at 3:44 PM, Plaintiff received a similar ATDS call with a distinctive click and pause at the beginning from "Anthony Diaz" using the caller ID 347-707-7973. Plaintiff hung up when he realized it was FCS calling, as he was not interested and wanted to be left alone.

**99.**     On July 26, 2018 at 10:27 AM, Plaintiff received an incoming call from "Anthony Diaz" at FCS, from the caller ID 347-707-7943. During this voicemail, "Anthony Diaz" attempted to get the Plaintiff to purchase FCS's services.

**100.**     On August 1, 2018 at 10:57 AM, Plaintiff received an automated call from 347-707-7996. Upon answering, Plaintiff heard a distinctive click and pause after the Plaintiff answered.

**101.**     In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**102.**     Plaintiff heard a "bloop" balloon-popping sound, followed by choppy audio and a machine noise, before he was connected with "Anthony Diaz" at FCS.

**103.**     Plaintiff then received a scripted sales pitch about business funding from "Anthony Diaz", on behalf of FCS.

**104.**     As a result of this automated call, on August 1, 2018 at 11:07 PM, "Anthony Diaz", anthony@fundingcapitalsource.com, sent Plaintiff an e-mail attempting to get Plaintiff to

purchase FCS' services.

**105.** FCS did not have the Plaintiff's prior express written consent to make these calls.

**106.** In fact, before filing this lawsuit, the Plaintiff wrote to FCS via e-mail on August 1, 2018 at 7:54 PM asking if they had his prior express written consent to make the calls, but FCS did not provide any evidence of consent.

**107.** As a result of that e-mail, the Plaintiff was contacted via telephone at approximately 12:30 PM EST on August 3, 2018 by Attorney Robert C. Jacovetti, of Jacovetti Law, P.C. Attorney Jacovetti stated that he represents Funding Capital Source ("FCS").

**108.** Mr. Jacovetti sent Plaintiff a letter dated August 9, 2018 as a follow up to the August 3, 2018 telephone conversation. Mr. Jacovetti's letter stated: "My client has instructed all staff members not to attempt to contact you in any manner or form".

**109.** Attorney Jacovetti and the Plaintiff discussed the claims in this lawsuit on several occasions via telephone and e-mail, including on August 23, 2018.

**110.** However, despite these ongoing pre-suit negotiations and discussions, the Defendants did not comply with Plaintiff's request not to get any additional calls.

**111.** On August 27, 2018 at 11:24 AM, Plaintiff received a telemarketing call which displayed on Plaintiff's caller ID as 347-707-7995.

**112.** The telemarketing call began with a distinctive click and pause after the Plaintiff answered.

**113.** In fact, while waiting for a human being to arrive on the phone line, the Plaintiff repeatedly said "hello" into his telephone with no response.

**114.** Plaintiff heard choppy audio and a machine noise, before he was connected with "Adam" at FCS.

**115.** Plaintiff then received a scripted sales pitch about business funding from "Adam", on behalf of FCS.

**116.** Plaintiff asked "Adam" why FCS was continuing to make telemarketing calls to the Plaintiff, despite the fact that he had clearly told FCS to stop calling, and despite the fact that Plaintiff had threatened FCS with litigation. "Adam" said that he did not know.

**117.** Plaintiff sues Mr. Yashayev and Mr. Shargel individually under the Responsible Corporate Officer Doctrine.

**118.** Mr. Yashayev and Mr. Shargel make the day to day decisions for FCS

**119.** The defendants' *modus operandi* was to incorporate and use ATDS to solicit people including Plaintiff.

**120.** On August 30, 2018, Plaintiff filed his Original Complaint.

**121.** On September 3, 2018, Plaintiff e-mailed Attorney Jacovetti a true and correct copy of the filed summons and complaint.

**122.** On September 11, 2018, Plaintiff received an e-mail from Attorney Jacovetti threatening "long and protracted and costly litigation".

**123.** All of these facts demonstrate that Attorney Jacovetti had actual knowledge of Plaintiff's claims. Jacovetti should have once again told his clients to stop contacting the Plaintiff, but instead, his clients continued to purposefully harass the Plaintiff with solicitation calls and texts.

**124.** On or about September 25, 2018, Mr. Yashayev and Mr. Shargel were both served via Certified Mail with the summons and complaint.

**125.** On or about September 26, 2018, FCS CAPITAL LLC was served via Certified Mail with the summons and complaint.

**126.** Thus, the defendants had actual knowledge of Plaintiff's lawsuit, however, despite this

fact, the defendants continued to purposefully harass the Plaintiff with additional telemarketing calls and text messages.

**127.**    On Wednesday, October 17, 2018 at 2:37 PM, Plaintiff received an automated text message sent using an ATDS from 201-371-4678. This text message read:

"Hello JAMES, Are you struggling with *Cash Advances or business debt*? We can reduce your payments by 60%, reply for assistance.

Txt STOP to quit".

**128.**    Plaintiff replied "How can I reduce the payments?" at 2:39 PM. This was not an invitation to receive more calls from the defendants, but rather, it was an attempt to identify who was contacting him illegally.

**129.**    No one texted the Plaintiff back from this number, which is further evidence that is was not manually typed. It was obviously sent using an ATDS due to the impersonal nature of the marketing message, and the fact that Plaintiff's name was written JAMES in all capital letters. The message purported to include an "opt-out" mechanism by saying "STOP", which is indicative of a robotext sent using an ATDS.

**130.**    At 3:36 PM, Plaintiff received a missed call from "Tyrell" who works for Business Debt Experts. The Caller ID was 646-933-4739. "Tyrell" left the following voicemail:

"Hello James, this is Tyrell calling today with Business Debt Experts. We specialize in reducing and settling high cost merchant cash advances and other business-related debt. We just wanted to quickly introduce our services to see if you may be dealing with any troublesome business debt at this time. If so, please give me a call back directly at 646-933-4739. Thank you."

**131.**    Plaintiff received another call from "Tyrell" from 646-933-4739. As a result of this telemarketing call, "Tyrell Macklin" sent the Plaintiff an e-mail from

terrell@businessdebtexperts.com attempting to get the Plaintiff to do business with the defendants.

**132.**     The e-mail said Business Debt Experts provides "an Attorney-Based Debt Relief Program" with "full legal representation and representation".

**133.**     Plaintiff called "Tyrell" back on October 17, 2018 and asked "Tyrell" who the attorney is that he would be referred to. "Tyrell" danced around the question and would not give a direct answer. Plaintiff asked "Tyrell" if his company works with Attorney Robert Jacovetti. In response, "Tyrell" said that they do work with Attorney Jacovetti and forward new clients to Jacovetti.

**134.**     Plaintiff promptly told "Tyrell" not to call him again and informed "Tyrell" that he was currently suing his company in federal court.

**135.**     On Tuesday, October 23, 2018, Plaintiff received a text message from 646-933-4739 which said "Hello James, I just reviewed your corporate debt file which indicated you maybe interested in reducing or restructuring your loan payments. Are you still paying back on a cash advance or business loan?

**136.**     646-933-4739 is the same number which "Tyrell" used previously.

**137.**     The following is a spreadsheet listing dates and times that Plaintiff received telemarketing calls from the defendants:

| Calls to Plaintiff's Cell Phone (484) 626-3942 | | | | |
|---|---|---|---|---|
| **Date:** | **Time:** | **Caller ID:** | **Notes** | **ATDS Used?** |
| 5/4/2018 | 3:19 PM | 347-707-7972 | **Michael Deangelis** | **No** |
| 5/7/2018 | 12:28 PM | 347-493-7857 | **Michael   Deangelis' personal cell phone** | **No** |
| 5/7/2018 | 2:04 PM | 347-707-7961 | **Michael Deangelis** | **No** |
| 5/8/2018 | 11:46 AM | 347-707-7943 | **Michael Deangelis** | **No** |

| 5/8/2018 | 4:25 PM | 347-707-7943 | Michael Deangelis | No |
|---|---|---|---|---|
| 5/17/2018 | 2:06 PM | 201-455-3787 | Barry Shargel | Yes |
| 5/22/2018 | 12:15 PM | 347-707-7973 | Anthony Diaz | Yes |
| 5/23/2018 | 11:37 AM | 646-766-9487 | Anthony Diaz | Yes |
| 5/24/2018 | 3:29 PM | 347-707-7943 | Anthony Diaz, left voicemail | No |
| 7/23/2018 | 3:12 PM | 347-707-7973 | Anthony Diaz | Yes |
| 7/25/2018 | 3:44 PM | 347-707-7973 | Anthony Diaz | Yes |
| 7/26/2018 | 10:26 AM | 347-707-7943 | Anthony Diaz, left voicemail | No |
| 8/1/2018 | 10:57 AM | 347-707-7996 | Anthony Diaz | Yes |
| 8/23/2018 | 11:24 AM | 347-707-7995 | Adam Giblan | Yes |
| 10/17/2018 | 2:06 PM | 201-455-3787 | Automated Text | Yes |
| 10/17/2018 | 3:36 PM | 646-933-4739 | Tyrell Macklin | No |
| 10/17/2018 | 3:51 PM | 646-933-4739 | Tyrell Macklin | No |
| 10/23/2018 | 12:32 PM | 646-933-4739 | Tyrell Macklin | No |

**138.** At all times material hereto, Plaintiff was the subscriber of the telephone number 484-626-3942 and paid his cell phone bill through T-Mobile.

**139.** Prior to these unsolicited calls, the Plaintiff has never done any business with FCS and Plaintiff never provided FCS with his cellular telephone number.

**140.** Plaintiff also requested in his e-mail to have his number placed on FCS's internal Do-Not-Call list, and requested to receive a copy of FCS's internal company Do-Not-Call policy.

**141.** Defendants failed and/or refused to provide a written copy of their internal company Do-Not-Call policy to Plaintiff, despite a written e-mail request and notice of Plaintiff's intent to file a formal claim.

**142.** Pursuant to 47 CFR 64.1200(d)(1), a telemarketer is required, upon request, to send a consumer a written copy of their company Do-Not-Call Policy.

**143.** Defendants failed and/or refused to put Plaintiff's number on their internal company Do-Not-Call list.

**144.** To the extent Defendants contend that they obtained consent or agreement from Plaintiff for the calls at issue here, the Telemarketing Sales Rule, 16 C.F.R. § 310.5(a)(5), requires that such records be maintained. In any event, consent is an affirmative defense under the TCPA, this defense is unavailable unless Defendants can show that they had prior express consent in writing, and that they have otherwise complied with all of the requirements of 47 C.F.R. § 64.1200(c)(2), including maintaining written procedures on national do-not-call rules, training personnel on national do-not-call rules, maintaining an internal do-not-call list, and accessing the national do-not-call database no more than 31 days prior to making any calls, and maintaining records documenting such access. Defendants did not have prior express written consent to such calls from Plaintiff, and did not produce any such written consent, even though the Plaintiff contacted FCS inquiring about the calls before filing this lawsuit.

**145.** Plaintiff pays for each incoming and outgoing call on his telephone under an unlimited calling arrangement, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii).

**146.** Plaintiff received the calls on his private mobile telephone, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii). Plaintiff's telephone number is registered with T-Mobile as a cellular telephone number and is a residential telephone that is used for personal purposes.

23

**147.** These telephone solicitations constituted "calls" under the TCPA that were not for emergency purposes.

**148.** Plaintiff was harmed by these calls. Plaintiff was temporarily deprived of legitimate use of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

### JACOVETTI'S LIABILITY AND HIS ARRANGEMENT WITH FCS

**149.** FCS, doing business as "Business Debt Experts" has sent automated text messages to others, including a man in Maryland, Dan Boger, as recently as October 2018.

**150.** In one of those text messages, a representative of "Business Debt Experts, "Anna", said, "we are a law office (Law Offices of Robert Jacovetti) Business debt experts is our DBA name.https://bbb.org/us/ny/new-york/profile/lawyers/law-office-of-robert-jacovetti-pc-0121-136690".

**151.** Attorney Jacovetti and the Jacovetti Law defendants are vicariously liable for FCS' TCPA violations.

**152.** The Federal Communication Commission has instructed that sellers such as Jacovetti may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each

marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."
*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

153.    In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

154.    In fact, for more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

155.    On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[1]

156.    The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.  28 FCC Rcd at 6586 (¶ 34).

157.    The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the

---

[1]    *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

FCC Rcd at 6592 (¶ 46).

**158.**     Attorney Jacovetti and the Jacovetti Law defendants are liable for the FCS-commissioned telemarketing calls because they actively participated in those calls through guidelines they directed FCS, and any third parties they worked with, to follow.

**159.**     Jacovetti is also directly liable for the FCS-commissioned telemarketing calls because he actively participated in the calls by accepting the incoming business, which originated through the illegal telemarketing calls from FCS-commissioned telemarketing calls. Indeed, FCS's employees marketed Jacovetti's legal services on the call(s) to the Plaintiff.

**160.**     Jacovetti maintains control over FCS' actions as to telemarketing and other activities by directing the content of their agents' advertising as well as dictating the parameters for potential prospects that they would accept.

**161.**     Jacovetti knew (or reasonably should have known) that FCS was violating the TCPA on his behalf, and failed to take effective steps within its power to force the telemarketer to cease that conduct. Any reasonable seller that accepts "warm transfer" calls from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with TCPA rules and regulations.

162.    Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46).  Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

### Causes Of Action

### First Cause of Action
**(Negligent Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)**

163.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

164.    As a result of Defendants' and Defendants' agents' negligent violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

165.    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

### Second Cause of Action
**(Knowing and/or Willful Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)**

166.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

167.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3).

168.    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Third Cause of Action**
**(Negligent Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)**

**169.**    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**170.**    As a result of Defendants' and Defendants' agents negligent violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

**171.**    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Fourth Cause of Action**
**(Knowing and/or Willful Violation of the TCPA**
**"Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)**

**172.**    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**173.**    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(c)(5).

**174.**    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Fifth Cause of Action**
**(Negligent Violation of the TCPA "Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)**

**175.**    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**176.**    As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR

28

64.1200(d)(1), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Sixth Cause of Action
### (Knowing and/or Willful Violation of the TCPA
### "Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

**177.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**178.** As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(1) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

### Seventh Cause of Action

### (Negligent Violation of the TCPA "Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

**179.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**180.** As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR 64.1200(d)(3), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Eighth Cause of Action
### (Knowing and/or Willful Violation of the TCPA
### "Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

**181.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**182.** As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(3) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

### Ninth Cause of Action
**(Initiating An Outbound Unwanted Solicitation Telephone Call To A Person After They Have Registered Their Telephone Number on the Pennsylvania Do-Not-Call List, Pennsylvania's "Telemarketer Registration Act", 73. P. S. § 2245.2(A) )**

**183.**     Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**184.**     Defendants, and each of them, are "telemarketer[s]", as that term is defined in 73 P.S. § 2242.

**185.**     Plaintiff is a "residential telephone subscriber" as that term is defined in 73 P.S. § 2242.

**186.**     Defendant initiated outbound "telephone solicitation" calls, as that term is defined by 73 P.S. § 2242, to the Plaintiff's residential telephone number listed in paragraph 144, above, to Plaintiff when he had previously stated through his registration on the Pennsylvania Do-Not-Call list that he did not wish to receive any outbound telephone calls from Defendant, a violation of 73 P.S. § 2245(a)(2).

**187.**     The statutory violation described in paragraph 186 above is also a statutory violation of the Pennsylvania Unfair Trade and Practices and Consumer Protection Law, 73 P.S. § 2246(a).

**188.**     Plaintiff was statutorily damaged at least five (5) times by Defendant by the telephone call described in paragraph 137, above, and additional times that maybe found through discovery in the amount of $100.00 for each of these telephone calls, 73 P.S. § 201-9.2(a).

**189.**     According to Pennsylvania's Telemarketer Registration Act:
 **§2245.2 Unwanted telephone solicitation calls prohibited.**
(a) General rule. -- No telemarketer shall initiate or cause to be initiated a telephone solicitation call to a residential telephone number of a residential telephone subscriber who does not wish to receive telephone solicitation calls and has caused his name, address and telephone number to be enrolled on a do-not-call- list maintained by the list administrator.  This prohibition shall be effective 30 days after a quarterly do-not-call list is issued by the list administrator which first contains a residential telephone subscriber's name, address and residential telephone number.

**190.**    Telemarketers such as the defendants have thirty days after a quarterly Do Not Call list is issued to remove newly added names and numbers from their own calling list(s).

**191.**    According to the Pennsylvania Attorney General's website, quarterly updates to the PA Do-Not-Call list are released on January 1, April 1, July 1, and October 1 each year.[2]

**192.**    Therefore, under the PA Telemarketer Registration Act, Defendants had thirty (30) days from July 1, 2018 to remove Plaintiff's number from their outbound calling lists. Any calls that took place *after*, but not including, July 31, 2018 are violations of the PA Telemarketer Registration Act.

**193.**    Defendants called Plaintiff five (5) times after July 31, 2018.

**194.**    Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this statute. Plaintiff requests that the court treble the damage amount as permitted for these willful or knowing violations under 73 P.S. § 201-9.2(a).

**195.**    The Defendants may have further violated the PTRA, which can be identified through discovery. For example the PTRA provides, "it shall be unlawful for any telemarketer to initiate a telephone call to or receive a telephone call from a consumer in connection with the purchase of consumer goods or services, unless the telemarketer or the telemarketing business which employs the telemarketer is registered with the Office of Attorney General… at least 30 days prior to offering for sale consumer goods or services through any medium." 73 P.S. § 2241 § 3(a)-(b).

**196.**    It is believed, and therefore averred, that the defendants, and each of them, are not registered as telemarketer(s) with the Pennsylvania Attorney General's Office, as mandated by

---

[2]See https://www.attorneygeneral.gov/resources/telemarketing-in-pa/telemarketing-frequently-asked-questions/, then click the drop-down arrow for "When will the "Do Not Call" list be available to telemarketers".

73 P.S. § 2244. Additionally, it is believed, and therefore averred, that the defendants, and each of them, do not maintain a $50,000 surety bond with the Pennsylvania Attorney General's Office.

**197.**   Plaintiff further requests costs, and reasonable attorney fees as permitted under 73 P.S. § 201-9.2(a).

WHEREFORE, Plaintiff, James Everett Shelton, demands joint and several judgment in his favor against the named Defendants on this count in an amount of at least $1,500, plus costs, reasonable attorney fees as permitted by statute, and any other remedy deemed appropriate.

<u>**WHEREFORE, Plaintiff prays for relief against defendants, as follows:**</u>
**IV.   Prayer for Relief**

1. For awards of $500 for each negligent violation as set forth in actions 1-8.

2. For awards of $1,500 for each knowing and/or willful violation as set forth in actions 1-8.

3. For awards of $100 for each negligent violation in action 9.

4. For awards of $300 for each knowing/or willful violation as set forth in action 9.

5. Injunctive relief against Defendants, and each of them, to prevent future wrongdoing;

Total statutory damages: **$43,800** (Eighteen counts of "Sales call/Sales Text to a number registered on the National Do-Not-Call Registry", Eight counts each of "ATDS call/ATDS text", and one count each of "Failure to provide a copy of Defendant's Do-Not-Call Policy" and "Failure to Put Plaintiff's Number on Defendant's Do-Not-Call list, with treble damages for each, and six (6) counts of "Initiating An Outbound Unwanted Solicitation Telephone Call To A Person After They Have Registered Their Telephone Number on the Pennsylvania Do-Not-Call List, Pennsylvania's "Telemarketer Registration Act", 73 P.S. 2245(a).

6. Reasonable Attorney Fees, as permitted under 73 P.S. § 201-9.2(a).

7. Prejudgment interest at the maximum legal rate;

8. Costs of suit herein incurred; and

9. All such other and further relief as the Court deems proper.

### V.   <u>Demand for Jury Trial</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: November 12, 2018

*James E. Shelton*

James Everett Shelton
*Plaintiff, Pro Se*
316 Covered Bridge Road
King of Prussia, PA 19406
Phone: 484-626-3942
Jeshelton595@gmail.com

## **VERIFICATION**

I, JAMES EVERETT SHELTON, Plaintiff, verify that the facts set forth in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements made herein are subject to the penalties of 18 PA. C.S. § 4904 related to unsworn falsification to authorities.

Dated: November 12, 2018

*James E. Shelton*

JAMES EVERETT SHELTON